KENNETH S. HIXSON, Judge
Appellant Robert Glenn Brown appeals after he was convicted by a Pulaski County Circuit Court jury of rape and was sentenced to serve a total of 300 months' imprisonment. On appeal, appellant contends that the trial court abused its discretion in ruling that the Instagram messages and testimony about their contents were sufficiently authenticated to be admissible. We reverse and remand for a new trial.
I. Relevant Facts
In summary, appellant was charged with raping his daughter, L.B, who was less than fourteen years old at the time, in violation of Arkansas Code Annotated section 5-14-103 (Supp. 2017). Appellant lived in Texas with his current wife and nine children. Appellant is L.B.'s father. Appellant never had a father/daughter relationship with L.B. and had not seen or communicated with her for several years. L.B. and her mother, Janet Hurst, lived in Little Rock, Arkansas. Janet Hurst thought that L.B. needed a father figure in her life. Therefore, Janet contacted appellant in Texas via Facebook. Eventually, according to Janet, appellant and L.B. communicated via social media and telephone. Finally, in September 2014, appellant, upon Janet's *538 invitation, visited L.B. and Janet. Appellant stayed at Janet's house for approximately a month. Janet testified that because she has another child and did not have a spare bedroom, appellant slept in the same bedroom and in the same bed with his then approximately twelve- or thirteen-year-old daughter. By all accounts the month-long visit generally went well. However, it was alleged that on the last night of his visit, appellant raped his daughter and then left to go back to Texas.
Apparently, thereafter, there was no communication between appellant and Janet Hurst or L.B. for two years. Janet Hurst testified that she routinely reviewed L.B.'s cell phone. In 2016, Janet found some recent Instagram messages on the phone. Those messages were allegedly between L.B. and appellant. In the string of Instagram messages, appellant allegedly confessed that he had raped L.B. two years earlier. Janet confronted her daughter with the Instagram messages and subsequently contacted the police. Thereafter, appellant was charged with rape.
Before trial, appellant filed a preliminary motion to determine the admissibility of the Instagram messages and their content at trial. Appellant admitted that the statements in those messages could be construed as a confession; however, he denied authoring the messages in question. He further maintained that the State had failed to provide any evidence linking him to the messages despite multiple subpoenas to various entities, including Facebook, internet-service providers, and Yahoo. Therefore, appellant argued in relevant part that the messages were inadmissible because they could not be authenticated under Arkansas Rule of Evidence 901 (2017).
At a preliminary hearing on appellant's motion, the State explained that it intended to introduce at trial screenshots of the 2016 Instagram messages that were obtained from L.B.'s cell phone. It alleged that these messages were exchanged between appellant and L.B. in 2016, two years after the crime had occurred and appellant had returned to his home in Texas. The State explained that Facebook, which owns Instagram, provided an IP address and a yahoo email address associated with the Instagram account in question. However, the internet-service provider for that IP address, Comcast, does not keep records past 180 days. Therefore, there was no electronic evidence linking the Instagram account to appellant. Nevertheless, the State argued that the similarities between the 2016 Instagram profile and a 2014 Instagram profile that L.B. alleged she had previously used to communicate with appellant in conjunction with the content of the messages themselves was sufficient authentication.
During the preliminary hearing, L.B. testified that in 2014, she communicated with appellant via an Instagram account and by telephone. L.B. testified that the messages she received in 2016 came from a different Instagram account. She testified that the 2014 account and the 2016 account had the same profile picture and contained the same quote "Family sticks up for family." L.B. further explained on direct examination that the 2014 account used the name Rob Brown Matoskah, and the 2016 account used the name Rob B/M with the username robbm00. Therefore, L.B. testified that she believed the account had belonged to appellant.
On cross-examination, L.B. admitted that she did not remember the name on the 2014 Instagram account. She additionally admitted that it was easy to create an Instagram account under any name and to use any picture and quotation that one would want during the creation process. Further, she admitted that anyone can see *539 that information and copy that information if it is a public account. Thus, L.B. testified that based on her familiarity with the platform, if one knew or had access to an account name, photo, and quote, one could create another account with a similar username, same digital profile picture, and same profile quote. Moreover, she admitted that although she had not told anyone about the incident, she was the first one to raise the issue of rape in the 2016 exchanged messages.
The content of the 2016 Instagram messages is as follows:
ROBBM 00: Hey baby girl I miss u
[LB]: I don't want to talk to you
ROBBM 00: What are u still doing up u need to sleep u have school today
[LB]: Who are u.... Oh yeah I forgot about having a dead beat father out there
ROBBM 00: Shut up b* * * * Ima great father u don't know me so u can't judge me from a few small mistakes
[LB]: Exactly I don't even know my own dad ... Really u call rape a small mistake. You call leaving me when I was a baby a small mistake....
ROBBM 00: Yes and I'm sorry about that I'm about to go to prison for the rape charge and I'm sorry
[LB]: Really ur sorry wow ... If u throw a plate Does it brake (yes) If you say that you are sorry for breaking the plate does it fix the plate? ? ?
ROBBM 00: No but what does a plate have to do with this
[LB]: Dad I'm the plate!!!
ROBBM 00: Oh well I'm sorry
[LB]: All u ever do is apologize I don't want to hear it anymore I'm done with u ... I have lost everything I have nothing and I have no one nor anyone who loves me I don't care what u needed to tell me but I'm done I'm done I'm done I'm done I almost killed myself 2 different times I have this guy who I love with all my heart and I can't have him Bc he has moved on and so I feel stupid and so I feel stupid for still loving him but I can't stop this stupid heart of mine it can't ever get the hint when someone gives up on me
ROBBM 00: Well honey I love you
[LB]: Ur love makes me sick
[LB]: Please just leave me alone u were always good at that ...
ROBBM 00: Just go kill you self u would be better off dead u have nothing left to Live for go ahead end what no one cares about I bet no one would even notice you were gone I hope you die b* * * *
Appellant testified at the preliminary hearing that he had only one Instagram account, Brown RB8433, and that he did not have an Instagram account with the username Robbm00. In fact, he denied talking to his daughter on Instagram at all in 2016 and denied sending the messages quoted above. Moreover, appellant testified that his internet-service provider had been Bryce Broadband since 2013 or 2014 and further explained that Comcast does not provide service in the area of Texas where he lives. On cross-examination, appellant stated that he recognized the name "Matoskah." He explained that he had a business named Matoskah Tattoos and that the name was also on his Facebook page.
At the end of the preliminary hearing, appellant's counsel reiterated that there was no electronic evidence linking appellant to the account in question. Counsel further argued that even L.B. admitted that anyone can create an account with a similar name and picture. Moreover, counsel argued that nothing in the content of *540 the messages was known only to appellant. Despite the fact that the State presented no evidence that linked appellant to the 2016 account except for L.B.'s testimony, the trial court denied appellant's motion and ruled that the evidence was admissible.
At trial, Janet testified that she and appellant have one child together, the victim L.B. She and appellant separated in 2004 when L.B. was approximately three years old, and she did not see him again until 2008. Janet testified that she contacted appellant in 2014 through Facebook, and appellant gave his phone number for L.B. to call him. According to Janet, appellant and L.B. talked on the telephone and through social media, and appellant visited from Texas in September 2014 for approximately a month. During appellant's visit, appellant shared the same bedroom and bed as L.B. since Janet explained that they did not have an extra room. She thought the visit went well, and appellant left in October 2014. L.B. was very emotional after appellant left, and Janet just thought that L.B. had missed him. In 2016, Hurst found the Instagram messages on L.B.'s phone and confronted L.B., who told her that appellant had raped her during his 2014 visit. Janet called the police and gave L.B.'s phone to Detective Rick Harmon as evidence.
Detective Harmon testified that the crime-scene officers took photographs of the September 26-27, 2016 Instagram messages. During his investigation, it was discovered that the 2016 Instagram account was registered on August 5, 2016, with the email address snapchat341@yahoo.com. Detective Harmon further testified that the internet-service provider that had been used was Comcast. Detective Harmon admitted that the 2016 Instagram account could not be linked electronically or otherwise, appellant other than by L.B.'s statement.
L.B. testified that appellant had inappropriately touched her during his 2014 visit. She explained that on the night before he left, appellant told her that he was returning back to his home and family in Texas. After they went to bed, she pretended to be asleep while he raped her. Her testimony regarding the 2016 Instagram messages mirrored her testimony at the preliminary hearing. On cross-examination, L.B. admitted that she had felt abandoned by her father but denied holding a grudge against him.
Jayme Brown, appellant's current wife, testified that she and appellant have nine children, seven of which are his biological children. Two of the girls were approximately fifteen and seventeen years old. Jayme testified that she had never seen appellant act inappropriately with the girls. She further testified that she had access to appellant's social media accounts and that appellant's only Instagram account was named Brown RB 8433 Matoskah. She explained that their internet-service provider was Bryce Broadband and that Comcast does not provide service in their area. Moreover, Brown testified that appellant was in bed with her on the evening of September 26, 2016 (the date and time the alleged Instagram messages transpired).
Appellant testified and denied inappropriately touching L.B. and sending the 2016 Instagram messages. He admitted that he visited L.B. in 2014 after Janet had contacted him and invited him to get to know L.B. Appellant testified however, that L.B. was very angry with him when he told her that he was returning to Texas after his 2014 visit. He explained that she had locked herself in her mother's room, and he felt that L.B. was jealous of his other family in Texas. Appellant testified, *541 as he did at the preliminary hearing, that he had only one Instagram account, Brown RB8433, and that he did not create the 2016 Instagram account with the username Robbm00. In addition to the one Instagram account, appellant testified that he had two Facebook accounts. One Facebook account has all his children on it, including L.B., and has the name Matoskah on it. The other Facebook account was used for his business. Appellant further reiterated that Comcast did not provide internet service in his area and that his internet-service provider was Bryce Broadband.
C.V., appellant's sixteen-year-old stepchild, testified that appellant is a great father and had never done anything sexually inappropriate. Additionally, Connie Kilanowski, appellant's mother-in-law, testified on appellant's behalf. Kilanowski testified that she thought appellant was the best father she had seen. She further testified that she had never seen him do anything that was sexually inappropriate around his children or grandchildren.
After the jury found appellant guilty, this appeal followed.
II. Instagram Messages
Appellant argues on appeal that the Instagram messages were inadmissible at trial because they were not properly authenticated under Arkansas Rule of Evidence 901. It is well settled that challenges to the admissibility of evidence are left to the sound discretion of the trial court, and a trial court's ruling on these matters will not be reversed unless there has been an abuse of discretion. Kauffeld v. State , 2017 Ark. App. 440, 528 S.W.3d 302. Nor will we reverse absent a showing of prejudice. Id.
Authentication of a document is a condition precedent to admissibility. Davis v. State , 350 Ark. 22, 86 S.W.3d 872 (2002). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Ark. R. Evid. 901(a). Rule 901 further provides that the testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to authenticate evidence and also that appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, can be used to authenticate evidence. Ark. R. Evid. 901(b)(1) & (4). However, in Gulley , our supreme court added an additional requirement in a case involving the authentication of text messages. Gulley v. State , 2012 Ark. 368, 423 S.W.3d 569. Gulley had alleged that three text messages were not authenticated because the State failed to show that he actually authored the messages but merely proved that the messages came from a cellular telephone number assigned to him. Id. There, our supreme court held that all three text messages were authenticated because there was other evidence linking Gulley to the texts. Id. Recognizing the slippery slope of authentication of electronic communications, our supreme court added the following requirement in an attempt to assure the text messages were actually from Gulley:
Gulley cites this court to Commonwealth v. Koch , 39 A.3d 996 (Pa. Super. 2011), in support of his contention that the text messages at issue in his case were not properly authenticated. Because the text messages at issue were properly authenticated, as required by Arkansas Rule of Evidence 901, we need not look to other jurisdictions to resolve this issue. We note, however, that the Koch Court held that the authentication of electronic communications requires more than mere confirmation that the telephone number belonged to a particular *542 person; circumstantial evidence, which tends to corroborate the identity of the sender, is also required. Id. at 1005. In the instant case, sufficient circumstantial evidence was presented to corroborate the identity of the sender.
Gulley v. State , 2012 Ark. 368, at 15 n. 4, 423 S.W.3d 569, 579 n.4 (emphasis added).
Our court reiterated this additional requirement in Duvall v. State , 2018 Ark. App. 155, 544 S.W.3d 106, when we said, "Our supreme court has required 'sufficient circumstantial evidence' to 'corroborate the identity of the sender'; in other words, there must be some indicia of authorship. " Duvall v. State , 2018 Ark. App. 155, at 13, 544 S.W.3d 106, 114 (emphasis added). In each of the cases decided by this court since Gulley in which we held that electronic evidence was authenticated and admissible, there has been sufficient circumstantial evidence corroborating the identity of the sender. See McPherson v. State , 2017 Ark. App. 515, 532 S.W.3d 96 (the victim had actual knowledge that the defendant was the sender of the Snapchat messages at issue because she subsequently met up with the defendant as instructed in the Snapchat messages); Hoey v. State , 2017 Ark. App. 253, 519 S.W.3d 745 (the text messages, photos, and internet searches at issue were retrieved from the defendant's cell phones); Donley v. Donley , 2016 Ark. 243, 493 S.W.3d 762 (the defendant had acknowledged that it was her Facebook account and that the comments at issue were made under that same account); Todd v. State , 2012 Ark. App. 626, 425 S.W.3d 25 (the defendant admitted upon his arrest that he had been talking to the victims for about two weeks).
Finally, although just persuasive authority, we found U.S. v. Vayner , 769 F.3d 125 (2014), to be helpful to our analysis. There, the Second Circuit reversed a district court's decision to allow the special agent to introduce printouts from a VK (the Russian equivalent of Facebook) profile page. The Second Circuit held that the government failed to provide extrinsic information showing that Zhyltsou was the page's author or otherwise tying the page to Zhyltsou. "It is uncontroverted that information about Zhyltsou appeared on the VK page: his name, photograph, and some details about his life consistent with Timku's testimony about him. But there was no evidence that Zhyltsou himself had created the page or was responsible for its contents.... And contrary to the government's argument, the mere fact that a page with Zhyltsou's name and photograph happened to exist on the Internet at the time of Special Agent Cline's testimony does not permit a reasonable conclusion that this page was created by the defendant or on his behalf." Id. at 132.
Although L.B.'s testimony was sufficient to authenticate that the photographs of the Instagram messages accurately reflected the images on her phone, she admitted that she did not have any actual knowledge that appellant was the one sending those messages. In fact, the evidence introduced at the preliminary hearing directly undermined the State's argument that appellant sent those messages. L.B. testified that the 2016 messages were sent from a new Instagram account that appellant had not previously used to communicate with her. The State alleged that appellant had sent the messages in 2016 after he had returned to his home in Texas and that the IP address was provided by Comcast, the internet-service provider; yet, the unrebutted testimony was that Comcast did not provide service in appellant's area and that his internet-service provider was Bryce Broadband. Additionally, even L.B. admitted that anyone could create another account with a similar username, same digital profile picture, and *543 same profile quote. Further, there was nothing in the content of the messages that was known only to appellant. Therefore, after reviewing the pertinent cases, we cannot say that the State provided sufficient circumstantial evidence to corroborate that appellant sent the alleged Instagram messages or that there is sufficient indicia of authorship. See Gulley , supra ; Duvall , supra . Thus, under these facts, the State failed to authenticate the Instagram messages, and the trial court abused its discretion in ruling that they were admissible.
That does not, however, end our inquiry. Even when appellant has proved error, where the evidence of guilt is overwhelming and the error slight, we can declare the error harmless and affirm. Scamardo v. State , 2013 Ark. 163, 426 S.W.3d 900. However, as in Scamardo , we cannot say here that the evidence was so overwhelming as to appellant's guilt or that the error was so slight. Absent appellant's confession, the main evidence supporting the convictions was L.B.'s testimony and her statements to third parties. Because credibility was critical to the jury's resolution of the conflicting stories, we reverse and remand for a new trial. See Rogers v. State , 2018 Ark. 309, 558 S.W.3d 833.
Reversed and remanded.
Gladwin, Glover, and Vaught, JJ., agree.
Gruber, C.J., and Brown, J., dissent.