J-A07002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | No. 879 MDA 2023 |

Appeal from the Dispositional Order Entered April 27, 2023
In the Court of Common Pleas of Lancaster County
Juvenile Division at No:  CP-36-JV-0000671-2022,
CP-36-JV-0000714-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.L.C. A MINOR | : | |
| | : | No. 1461 MDA 2023 |

Appeal from the Dispositional Order Entered April 27, 2023
In the Court of Common Pleas of Lancaster County
Juvenile Division at No:  CP-36-JV-0000714-2022

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:          **FILED: JUNE 17, 2024**

In these consolidated appeals, Appellant, J.L.C., a minor, seeks review

of orders of the Court of Common Pleas of Lancaster County (juvenile court)

adjudicating him delinquent of sex offenses against two minor victims.

Appellant now contends that the juvenile court erred in disregarding one of

---

[*] Former Justice specially assigned to the Superior Court.

the victim's lab results despite the stipulated authenticity of the report; he also claims with respect to both victims that the evidence was legally insufficient as to the consent element of the charged crimes. We affirm.

The first of the two cases arose from events that took place on October 31, 2021. The victim, A.C. had been exchanging messages with Appellant on the social media application, Snapchat. A.C. and Appellant had not yet met in person, and Appellant invited A.C. to the home of his friend, Thomas Barney.

A.C. agreed, and she was picked up in a car by Appellant and his friend, "Tray." After arriving at Barney's home, the group watched a movie on a couch in the basement. A.C. recounted that she sat next to Appellant, and that he had digitally penetrated her.

After the movie ended, A.C. and Appellant went to the main level of Barney's house and sat on another couch in that area of the home. Appellant began undressing both himself and A.C., who tried to "scoot backward" on the couch to avoid contact. N.T. Adjudicatory Hearing, 3/16/2023, at 45. A.C. was unable to back away from Appellant because he had pinned her legs. While pinned, she told Appellant that she was not ready to be sexually active, and felt "uncomfortable with it," but Appellant ignored her. ***See id***., at 46. A.C. tried to push Appellant away, but she was overpowered as Appellant penetrated her vagina with his penis. ***See id***.

A few minutes later, Barney came upstairs and saw Appellant with A.C. on the couch. Barney agreed to let Appellant and A.C. go into his bedroom as

long as they did not have sexual intercourse there. Appellant and A.C. then went upstairs to Barney's bedroom, where A.C. laid down and pretended to go to sleep. Appellant again digitally penetrated her vagina, and she eventually fell asleep while Appellant was still next to her.

A.C. woke up at Barney's house early the next morning and realized that she was late for an event at school. Further, A.C.'s parents and friends were alarmed because they did not know A.C.'s location. She had left her phone at her friend's house before being driven to Barney's home – she had done so because her parents had downloaded a tracking app to the device. When A.C. arrived back at her own home, her parents caught her trying to sneak inside.

The friends and family of A.C. pressed her to tell them what had happened the prior evening, and A.C. eventually confided to the mother of a friend that she had sexual intercourse with Appellant. At first, A.C. suggested that she was possibly drugged at the time of that encounter, but she later believed that she was "just tired." *Id*., at 74.

A.C. initially did not allege that she had been raped by Appellant. She had contacted the police about the incident the morning after it occurred, but she did not report that Appellant had used force, and she did not want to press charges. About a year after the incident, A.C. came to believe that she was in denial about what happened, at which point she alleged that Appellant had raped her after she had told him that she did not want to have sex. *See id*., at 75.

The second case stemmed from an incident on May 26, 2022. The victim in the case, C.P.R., was 14 years old. As with the prior incident, Appellant met the victim through Snapchat. Appellant invited C.P.R. to his house, and she agreed, walking there for about 45 minutes, and arriving at midnight. When she arrived, Appellant took her to the basement. C.P.R. turned off her phone and left it on the ground level of the house.

According to C.P.R., she and Appellant smoked marijuana, causing her to feel dizzy and nauseous. C.P.R. told Appellant that she was "freaking out" and needed to lay down. *Id*., at 11. In response, Appellant said, "calm down," as he led her to a bed in the basement. He continued telling C.P.R. to calm down as he joined her in the bed.

Without speaking, Appellant began undressing himself and C.P.R. In C.P.R.'s account, she was unable to move, and she slipped in and out of consciousness several times, waking up to find herself in different sexual positions. C.P.R. felt pain in her vagina, and she realized that it was being caused by Appellant penetrating her with his penis. She told Appellant to stop, but he refused and told her to "shut up because his parents [we]re upstairs." *Id*., at 16.

Once the sexual encounter ended, C.P.R. walked upstairs with Appellant to retrieve her phone. The two then walked to Appellant's second floor bedroom, where he took C.P.R.'s phone to delete their Snapchat messages. C.P.R. walked home from Appellant's house at about 5:00 a.m. Appellant

advised C.P.R. just before she left that she should not tell anyone about what they had done the prior night.

On the morning of May 27, 2022, C.P.R. reported to a nurse at her school that she had been raped. *See id*., at 37. She was later interviewed by Detective Beth Rivera, and her blood and urine were tested for drugs after the school day had ended. C.P.R. told Detective Rivera initially that she had gone to Appellant's house upon leaving her friend's home, when in fact she had left the home of her boyfriend at the time. She also told the detective that Appellant had forced her to smoke marijuana.

However, C.P.R. later admitted that she had misrepresented her whereabouts prior to walking to Appellant's house. C.P.R. stated that she had lied to the detective because her mother had been present during the interview, and she did not want her mother to know that she had a boyfriend, and that she went to Appellant's house to smoke marijuana. *See id*., at 24, 36. Although the lab test result indicated that no drugs could be detected in C.P.R.'s system, she insisted that she had inhaled marijuana smoke and felt its effects. *See id*., at 40.

In fact, when Detective Rivera interviewed Appellant about his interactions with both victims, Appellant partly corroborated C.P.R.'s account. He confirmed that the two of them had smoked marijuana together, and that he told her at one point to "calm down" when she said that she was starting to "freak out." *Id*., at 144.

Appellant was not immediately charged with any offenses related to C.P.R. That did not occur until A.C. came forward as an accuser against Appellant in response to requests by police for her to do so. **See id**., at 134-35. As to the case involving C.P.R., the Commonwealth charged Appellant with rape, 18 Pa.C.S.A. § 3121(a)(3); sexual assault, 18 Pa.C.S.A. § 3124.1; aggravated indecent assault (without consent), 18 Pa.C.S.A. § 3125(a)(1); and indecent assault (without consent), 18 Pa.C.S.A. § 3126(a)(1). As to the case involving A.C., the Commonwealth charged J.L.C. with sexual assault; aggravated indecent assault (without consent); and indecent assault (without consent).

The two cases were tried together at a single adjudicatory hearing before the juvenile court on March 16, 2023. At that hearing, the Commonwealth presented the testimony of both A.C. and C.P.R., both of whom testified to the facts outlined above. Detective Rivera and Barney also testified consistently with the victims in all material respects.

In order to rebut C.P.R.'s testimony, the defense introduced the lab report containing the results of the drug testing that she had submitted to a few hours after her encounter with Appellant. The Commonwealth stipulated that the lab report was "a true and accurate report and that its contents are what they indicated." N.T. Adjudicatory Hearing, 3/16/2023, at 135. The report reflected that no drugs were detected in C.P.R.'s system. The defense argued, based on the report, that C.P.R. could not have been truthful

regarding her allegation that Appellant had raped her while she was under the influence of the marijuana.

After the lab report was admitted into evidence, the juvenile court questioned the reliability of the test results. The juvenile court stated, "I don't have an expert here to explain it to me. Maybe there was something wrong with the test." *Id*., at 145. The juvenile court continued, "Maybe it just doesn't show up for a couple of hours. Maybe that's possible. Maybe their tests aren't that accurate. Maybe somebody screwed up." *Id*., at 146.[1]

At the conclusion of the adjudicatory hearing, the juvenile court found that Appellant had committed the charged offenses against both victims beyond a reasonable doubt. The Commonwealth and defense counsel had described the two cases as being contingent on the credibility of the victims, and the juvenile court found "without any doubt that the two victims [were] credible." *Id*., at 159. Appellant was adjudicated delinquent and ordered to participle in Diversified Treatment Alternatives.

Appellant timely appealed, and the juvenile court complied with Pa.R.A.P. 1925(a). *See* Juvenile Court 1925(a) Opinion, 7/10/2023. Appellant now raises the following three claims in his brief:

> 1. Whether the [juvenile] court abused its discretion and committed an error of law when it questioned the validity of a

---

[1] The juvenile court later added in its 1925(a) opinion that the stipulation "did not provide a sufficient basis for [it] to find that the victim did not smoke marijuana or that the victim was conscious during sexual intercourse with [Appellant.]" Juvenile Court 1925(a) Opinion, 7/10/2023, at 4.

- 7 -

stipulation of fact concerning MNS Lab results, which indicated that the alleged victim C.P.R. did not have alcohol or drugs in her system during the time of the incident, where the court later held that the test was inaccurate or improperly conducted?

2. Whether the evidence presented by the Commonwealth was insufficient to prove beyond a reasonable doubt that [Appellant] committed the offenses of Rape — Unconscious or Unaware Victim, Sexual Assault, Aggravated Indecent Assault — Without Consent, and Indecent Assault — Without Consent — with regard to alleged victim C.P.R., where the evidence did not establish that CPR was unconscious or unaware or that C.P.R. withheld consent to the sexual contact?

3. Whether the evidence presented by the Commonwealth was insufficient to prove beyond a reasonable doubt that [Appellant] committed the offenses of Sexual Assault, Aggravated Indecent Assault — Without Consent, and Indecent Assault — Without Consent — with regard to alleged victim AC, where the evidence did not establish that A.C. withheld consent to the sexual contact?

Appellant's Brief, at 7 (renumbered).

Appellant's first claim is that the juvenile court erred in rejecting the reliability of C.P.R.'s lab report despite the parties' stipulation that its contents were a true and accurate reflection of the results of C.P.R.'s drug testing. For the following reasons, we find that this claim has no merit.

A court's evidentiary rulings are subject to an abuse of discretion standard of review. *See Commonwealth Woeber*, 174 A.3d 1096, 1100 (Pa. Super. 2017). Such a ruling will only be reversed "where a clear abuse of discretion occurs." *Commonwealth v. Johnson*, 638 A.2d 940, 942 (Pa. 1994). "[W]here the evidentiary ruling turns on a question of law our review is plenary." *Id*. (quoting *Buckman v. Verazin*, 54 A.3d 956, 960 (Pa. Super. 2012)).

"A stipulation is a declaration that the fact agreed upon is prove [, and a] valid stipulation must be enforced according to its terms." ***Commonwealth v. Mitchell***, 902 A.2d 430, 460 (Pa. 2006) (quoting ***Commonwealth v. Rizzuto***, 777 A.2d 1069, 1088 (Pa. 2001)). Areas not subject to stipulation include those which are "inherently and traditionally the prerogative of the judiciary." ***Commonwealth v. Perrin***, 291 A.3d 337, 344 (Pa. 2023). It is well established that "[t]he finder of fact . . . exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence." ***Id***. (quoting ***Commonwealth v. Sanchez***, 36 A.3d 24, 26-27 (Pa. 2011)).

"Pennsylvania Rule of Evidence 901 provides that authentication is required prior to admission of evidence." ***Commonwealth v. Koch***, 39 A.3d 996, 1002 (Pa. Super. 2011). "Authentication generally entails a relatively low burden of proof; in the words of Rule 901 itself, simply 'evidence sufficient to support a finding that the item is what the proponent claims."' ***Commonwealth v. Koch***, 106 A.3d 705, 713 (Pa. 2014) (quoting Pa.R.E. 901(a)). In other words, once a piece of evidence is authenticated, the finder of fact must then assign it weight. ***See id***. When doing so, the trier of fact is free to believe all, part, or none of the evidence, and a document's authentication is merely a prerequisite for it to be considered. ***See id***.

Here, the juvenile court accepted that C.P.R.'s lab report was authenticated pursuant to the parties' stipulation. The juvenile court did not question that the lab report's contents indicated that no drugs or alcohol could

be detected in C.P.R.'s system at the time she was tested. However, the juvenile court was not bound to accept the lab report as true.

The authentication of the lab report also was not dispositive as to whether Appellant committed the charged offenses against C.P.R. The juvenile court correctly pointed out that Appellant himself admitted to smoking marijuana with C.P.R. and that he tried to calm her down after she began reacting to it. Inasmuch as there was a conflict in the evidence regarding whether C.P.R. was rendered unconscious by the effects of marijuana, the juvenile court was permitted to weigh the evidence and conclude that the victim (and Appellant) had testified truthfully. Thus, the juvenile court did not abuse its discretion in declining to credit the lab report, and no appellate relief is due on that ground.

Appellant's remaining claims concern the sufficiency of the evidence as to the lack of the victims' consent to sexual contact, which is a material element of all of the charged offenses in both cases. *See* 18 Pa.C.S.A. § 3121(a)(3) (rape); 18 Pa.C.S.A. § 3124.1 (sexual assault); 18 Pa.C.S.A. §3125(a)(1) (aggravated indecent assault (without consent)); and 18 Pa.C.S.A. § 3126(a)(1) (indecent assault (without consent)).

The standard for the sufficiency of the evidence at an adjudicatory hearing is identical to the standard applicable at a criminal trial. *See In re A.V.*, 48 A.3d 1251, 1252-53 (Pa. Super. 2012). When considering a challenge to the sufficiency of the evidence in a juvenile case, "we must review the entire record and view the evidence in the light most favorable to the

Commonwealth" and draw all reasonable inferences in favor of that party. *Id*. The evidence will be deemed sufficient if the Commonwealth has proven "every element of the crime beyond a reasonable doubt," and this may be accomplished "by wholly circumstantial evidence." *Id*. "Evidentiary sufficiency is a question of law and, therefore, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Sanchez***, 36 A.3d 24, 37 (2011) (citing ***Commonwealth v. Meals***, 912 A.2d 213, 218 (Pa. 2006)).

As to the offenses relating to the incident with A.C., Appellant argues that the there was insufficient evidence of lack of consent because her testimony was not credible. At the adjudicatory hearing, A.C. testified that Appellant had forced her to have sexual intercourse after she had stated verbally to him that she was not ready to be sexually active. She testified further that Appellant pinned down her legs after she tried to push him away and "scoot" back from him on a couch.

The defense urged the juvenile court not to accept A.C.'s testimony, suggesting that she had an ulterior motive to incriminate Appellant, as shown, for example, by her admitted lies to her parents about where she had been on the night in question, and her delay in coming forward as a rape victim. But to the extent that A.C.'s conduct, and any other the evidence in the record, conflicts with the allegations, it was the role of the juvenile court to weigh her credibility. Here, the juvenile court found A.C.'s testimony to be credible regarding her lack of consent, and we find no basis in the record to disturb

that determination. ***See e.g., Commonwealth v. Andrulewicz***, 911 A.2d 162, 166 (Pa. Super. 2006) ("[T]he court was free to accept [the victim's] characterization of what transpired with Appellant, particularly her representation that Appellant 'raped' her[.]").

As to the offenses relating to the incident with C.P.R., Appellant argues that the there was insufficient evidence of lack of consent because the victim's testimony was fully discredited by the lab report, which indicated that she had not been under the influence of drugs as she had claimed. However, we find that the evidence of lack of consent was legally sufficient despite some apparent inconsistencies in the evidence.

C.P.R. testified that, on the night of her encounter with Appellant, she smoked marijuana with him and blacked out several times, waking up periodically to find that J.L.C. was sexually assaulting her. She also testified that she "couldn't move" and that Appellant told her to "shut up," when she objected to his unwanted advances. ***Id***., at 16.

Appellant's statements during the investigation were consistent with C.P.R.'s testimony in several important respects, namely, C.P.R.'s use of marijuana and her reaction to it. Although a lab test did not detect any drugs in C.P.R.'s system, this did not refute her testimony as a matter of law. Rather, the lack of corroboration in the lab test merely constituted arguably inconsistent evidence with C.P.R.'s testimony. It was the juvenile court's role, as the finder-of-fact, to consider conflicting evidence and assign it weight. ***See Andrulewicz***, 911 A.2d at 166.

The juvenile court stressed in its 1925(a) opinion that both C.P.R. and Appellant had recalled that C.P.R. smoked marijuana, and that Appellant told her to "calm down" when she started to panic. The juvenile court decided to credit their consistent testimony as to that fact, and to discount the lab report, finding it plausible (in the absence of expert testimony regarding how such tests work) that the report was not conclusive as to whether C.P.R. had been impaired by marijuana on the night in question. *See* Juvenile Court 1925(a) Opinion, 7/10/2023, at 2.

Accordingly, the juvenile court was not bound, as Appellant claims, to accept the lab report at face value and find that C.P.R.s allegations were not credible. It was rather within the juvenile court's discretion to accept the testimony of C.P.R. that she had been impaired by the effects of marijuana, and that Appellant had sexually assaulted her while she was unconscious. Thus, we find that the juvenile court did not err in finding that the evidence was sufficient to establish C.P.R.'s lack of consent beyond a reasonable doubt.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/17/2024

- 13 -